# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 17-428V
(to be published)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

GAYLE DILLENBECK,

             Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

             Respondent.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Special Master Corcoran

Filed:  July 29, 2019

Decision; Influenza ("flu") Vaccine;
Guillain-Barré Syndrome ("GBS");
Future Lost Wages; Pain and
Suffering.

*Michael Milmoe*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.

*Debra F. Begley*, U.S. Dep't of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On March 27, 2017, Gayle Dillenbeck filed a petition seeking compensation under the National Vaccine Injury Compensation Program.[2] ECF No. 1. Petitioner alleged that she suffered from Guillain-Barré syndrome ("GBS") as a result of receiving the influenza ("flu") vaccine on October 30, 2015. *Id.* Respondent acknowledged in his Rule 4(c) Report that the Petitioner's claim was compensable under the Act, and I issued a ruling on entitlement in Petitioner's favor early in the case's life. Ruling, dated October 23, 2017 (ECF No. 15).

The parties subsequently attempted to determine the proper damages to be awarded to Ms. Dillenbeck for her injuries, but could not reach an agreement on certain specific award

---

[1] This Decision will be posted on the United States Court of Federal Claims website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means that the Decision will be available to anyone with Internet access.** As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the published Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the Decision will be available to the public in its present form. *Id.*

[2] The National Vaccine Injury Compensation Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. § 300aa-10 through 34 (2012)).

components. The parties proposed to resolve their differences via hearing, first filing briefs laying out their positions on the disputed award elements. *See* Prehearing Memorandum, dated Nov. 16, 2018 (ECF No. 31) ("P. Mem."); Prehearing Memorandum, dated Feb. 4, 2019 (ECF No. 36) ("Opp."). The damages hearing was held on February 19, 2019, after which the parties were able to narrow several of their disputed damages issues, with post-hearing briefs mainly addressing a question raised by Petitioner's lost future wages damages component. *See* Respondent's Notice of Additional Authority, dated March 18, 2019, filed as Ex. A (ECF No. 42); Respondent's Post-Hearing Brief, dated May 1, 2019 (ECF No. 48) ("R. Post-Hr."); Petitioner's Post-Hearing Memorandum, dated June 3, 2019 (ECF No. 49) ("P. Post-Hr.").

In total, Petitioner requests $338,694.23 in damages (*see* Joint Status Report, dated May 1, 2019 (ECF No. 47)), but based on my review of the record and the parties' submissions, I find that Petitioner is entitled only to a damages award of **$221,996.64.** The basis for this determination is set forth below.

## I.   *Abbreviated Factual History*

Petitioner (who at the time held a position as a part-time veterinary technician ("vet tech")[3] at Bloomingdale Animal Hospital in Bloomingdale, Illinois) was sixty-one years old when she received the flu and pneumococcal conjugate vaccines at her primary care provider's office on October 30, 2015. Ex. 2 at 20. She had a history of rheumatoid arthritis, asthma, bone/joint problems, and occasional anxiety (with her preexisting arthritic pain being well-documented in the medical history). *Id.* at 21; *see also* Ex. 12 at 23-25, 31-36.

Approximately three weeks later, while being discharged from the hospital following gallbladder surgery, Ms. Dillenbeck complained of numbness in her feet, and she was noted to have an ataxic gait. Ex. 3 at 167. She was assessed with a possible neuropathy and referred to physical therapy ("PT"). *Id.* at 53, 170. Ms. Dillenbeck attended several sessions of PT over the next week, but her symptoms worsened. Ex. 8 at 1; Ex. 12 at 21. By December 2015, she was assessed with possible GBS (a diagnosis that was ultimately confirmed). Ex. 4 at 23-24.

During December 2015, Ms. Dillenbeck was admitted then discharged from the hospital for treatment of her GBS, thereafter attending outpatient PT through the end of January 2016. Ex. 3 at 25. Due to her hospitalization (and subsequent recovery period), Ms. Dillenbeck was out of work from November 15, 2015, through February 29, 2016. P. Mem. at 18.[4] By the end of

---

[3] At hearing, Ms. Dillenbeck described the duties and requirements of her job as a vet tech at Bloomingdale Animal Hospital. Tr. at 51-52. They included assisting the attending veterinarian with filling medication; running/reporting laboratory testing; monitoring animals during surgical procedures; restraining animals; and completing dental cleanings. *Id.*

[4] As discussed below, however, it appears that Petitioner's onset of GBS symptoms occurred around November 22, 2015. Ex. 2 at 24. The earlier-in-time absences were attributable to Ms. Dillenbeck's gallbladder surgery. *See* Ex. 7 at 6; Ex. 6 at 14, 26.

February, she had shown significant improvement, although she continued to complain of some paresthesia in her hands and feet, and also displayed reduced grip strength, some absent reflexes, and a wide-based gait. Ex. 4 at 12, 14. She was released to return to work in February, albeit with a fifteen-pound lifting restriction, returning to work at Bloomingdale on March 1, 2016. Tr. at 64; Ex. 4 at 10-11; Ex. 16 at 10.

Ms. Dillenbeck again saw her primary care physician in April 2016, now reporting that she no longer wished to be under the lifting restriction at work because she felt it was unnecessary (given her recovery progress). Ex. 4 at 4. Her doctor accordingly wrote a letter to her employer clearing her from all work restrictions. *Id.* at 7; Ex. 16 at 9. In the months thereafter, Petitioner continued to see her primary care provider for follow-up treatment, reporting that despite her initial improvement, she did not feel she had returned to a baseline level of health, with a number of secondary symptoms continuing to plague her (e.g., paresthesia in the hands and feet, chest sensitivity, and an unsteady gait). Ex. 4 at 4.

## II.     *Procedural History and Disputed Damages Components*

As noted, this case was filed in March 2017, and a little more than six months later Respondent conceded entitlement. An inability to agree to the proper quantum of damages is thus what has prevented full resolution of Petitioner's claim. After several months of informal discussions, the parties communicated to me that they had reached an impasse and requested a schedule for a damages hearing. *See* Status Report, dated May 31, 2018 (ECF No. 24). That hearing (set for February 2019) occurred, and both parties filed pre-hearing briefs in support of their respective positions (ECF Nos. 31, 36).

At the hearing's conclusion, the parties filed a status report indicating what areas of damages they agreed upon and what areas remained in dispute. *See* ECF No. 47. The parties agree that Ms. Dillenbeck is entitled to an award of **$2,314.59** reflecting out-of-pocket/unreimbursed expenses, and that she should receive *some* award for past lost wages, as well as a pain and suffering award component.

There are three main areas of disagreement to be resolved. First, the parties dispute the amount of past lost wages, with Respondent arguing for an award of **$7,230.00**, while Petitioner requests **$39,956.40**. ECF No. 47 at 1. As discussed in greater detail below, some of this dispute (as well as her future lost wages) turns on questions Respondent has raised regarding Petitioner's qualifications to be a vet tech in her home state of Illinois. Second, Petitioner requests **$46,020.00** in future lost wages, while Respondent contests her right to *any* amount of future lost wages at all.

Third, the parties have not reached an accord on the proper pain and suffering award. Petitioner requests an award at the statutory **$250,000.00** cap, based on past pain and suffering in the amount of $225,000, plus $5,000.00 per year going forward (assuming the Petitioner will live another twenty-two years) – a total sum that would exceed the cap, thus causing its application.

ECF No. 47 at 2. Respondent accedes to the general propriety of a pain and suffering award, but is only amenable to the somewhat reduced sum of **$135,000.00**, and has not provided a breakdown of past versus future subcomponents. *Id.* Finally, the parties disagree as to the propriety of a Medicaid lien payment. Petitioner maintains that the sum of **$403.24** is due and owing, while Respondent, questioning whether the medical charges in question were incurred in treatment of Petitioner's GBS and sequelae, disputes the need for any lien at all.

**III.** *Testimony at Damages Hearing*

Four fact witnesses testified at hearing: the Petitioner herself; her son, Shawn Dillenbeck; her daughter, Miranda Szydzik; and her son-in-law, Andrew Szydzik.

A.    <u>Gayle Dillenbeck</u>

Ms. Dillenbeck's testimony took up the majority of the damages hearing. *See* Tr. at 10-122; *see also* Affidavit, dated May 16, 2017, filed as Ex. 11 (ECF No. 9-1). She described both the nature of her GBS injury and ongoing sequelae as well as her employment history as a vet tech.

Ms. Dillenbeck began by discussing her overall health course leading up to October 2015. Prior to receipt of the flu vaccine, Ms. Dillenbeck was generally healthy. Tr. at 13. She had no serious health problems or complaints prior to that time period (apart from a rheumatoid arthritis diagnosis). *Id.* at 13, 58, 78-79. Ms. Dillenbeck participated in a number of outdoor activities, including hiking, walking with her dogs, and photography. *Id.* at 13-14, 15. She enjoyed completing various household tasks and socializing with friends and neighbors. *Id.* at 15-16. Ms. Dillenbeck also routinely cared for her grandchildren. *Id.* at 14-15.

Ms. Dillenbeck next recalled her receipt of the flu vaccine and subsequent hospitalization for GBS. Roughly two weeks following vaccination, she began to experience adverse GBS-related symptoms, and remained hospitalized for two weeks thereafter with a cascade of symptoms. Tr. at 30-32. She was unable to walk, and suffered from reduced strength and reflexes (including intense nerve pain spanning the entire body). *Id.* at 20-21, 33-34, 39-40, 45. Ms. Dillenbeck could not sleep and she spent many hours standing in order to relieve the pressure on her nerves. *Id.* at 38-39. She also recalled spending time in PT due to weakness in her legs. *Id.* at 39. Her treatment course included multiple rounds of IVIG therapy, and she routinely took Gabapentin for the associated nerve pain. *Id.* at 22.

Following her release from the hospital, Ms. Dillenbeck returned home. Tr. at 40. She required live-in care (provided by her daughter, son-in-law, and niece) for five to six months thereafter. *Id.* at 40-41, 47. Ms. Dillenbeck used a walker to help steady her gait, but would "fall quite often." *Id.* at 41, 43-44, 80. Her family members helped care for her animals and completed household tasks (including grocery shopping, driving, cooking, and laundry). *Id.* at 41-43. For the first six months following her hospitalization, Ms. Dillenbeck was taking eight Gabapentin pills

per day to treat her pain. *Id.* at 22. She also had trouble sleeping due to the persistent pain and fatigue she was experiencing. *Id.* at 23, 26-27. She attended outpatient PT two to three time per week. *Id.* at 45.[5] Ms. Dillenbeck also recalled feeling increased stress given the longevity of her illness. *Id.* at 48. As mentioned earlier, she worked as a vet tech and needed to return to her job by early March 2016 (as she was the sole financial provider for her own needs). *Id.* at 48, 65.

Ms. Dillenbeck's health has since improved but not returned to baseline. Tr. at 35. At hearing, she estimated that she has regained roughly seventy-five to eighty percent of her pre-illness strength. *Id.* She continues to experience a lack of sensation in her hands and feet, as well as increased sensitivity to touch on her chest, abdomen, and back. *Id.* at 17, 35 ("I can't reach into my purse and try and feel something"), 36, 46. The weakness in her hands has resulted in a loss of grip strength. *Id.* at 29-30.[6] Ms. Dillenbeck also continues to experience a "deep pain" in her abdomen, though she no longer takes Gabapentin. *Id.* at 17-19, 24.

In addition, Ms. Dillenbeck cannot complete the long walks she was accustomed to prior to her onset of GBS, and often experiences generalized fatigue and tiredness. Tr. at 16-17, 27-28. Her balance issues have persisted as well (due primarily to the resulting weakness on the right side of her body), and she still suffers from reduced reflexes. *Id.* at 28-29, 35-36. Based on conversations with her treating neurologist in December 2018, Ms. Dillenbeck maintained that she had likely "plateau[ed]" in her overall recovery (as her symptoms had remained the same over the past year). *Id.* at 36, 37 ("[w]hat he told me was pretty much that what I had wasn't going to improve"), 38. Her daily medication routine includes Prednisone (two tablets once per day) and Plaquenil (for unrelated rheumatoid arthritis), and she attends yearly follow-ups with her neurologist for monitoring of her GBS sequelae. *Id.* at 95, 115.

Ms. Dillenbeck also described her employment history relevant to the disputed damages issues. She is currently employed at Army Trail Animal Hospital in Bartlett, Illinois, as a receptionist. Tr. at 71, 96. She is paid $13.00 per hour and works full-time. *Id.* at 71, 73. Prior to her onset of GBS, however, Ms. Dillenbeck held a different job: as cross-trained vet tech/receptionist at Bloomingdale Animal Hospital, with slightly higher pay (a rate of $14.50 per hour on a 35 to 38 hour per-week basis[7]). *Id.* at 50-52, 53, 60.

---

[5] On cross examination, Respondent pointed out that Ms. Dillenbeck requested a discharge from PT at the end of January 2016 (given the good progression in her mobility). Tr. at 81-82.

[6] At hearing, Respondent made some reference to Petitioner's hand/grip symptoms being related to a carpel tunnel diagnosis. Tr. at 87-88; *see* Ex. 4 at 11. Ms. Dillenbeck recalled that a carpel tunnel diagnosis was possibly raised by an intern during an appointment with her neurologist, Dr. Gupta. Tr. at 90-92. She did not, however, remember discussing the diagnosis with Dr. Gupta or undergoing testing for it. *Id.* at 90-91, 109-10.

[7] According to Ms. Dillenbeck's testimony, Bloomindale annually increased her hourly rate (anywhere from .25 to .50 cents per hour). Tr. at 75-76.

At hearing, Ms. Dillenbeck testified that she had been employed at Bloomingdale for ten years (prior to her termination in May 2016). Tr. at 50. Ms. Dillenbeck was on sick leave at Bloomingdale beginning November 15, 2015, for her gallbladder operation, but had to greatly extend that period of time after her GBS manifested. *See* P. Mem. at 2; Ex. 6 at 24-27.

Following her recovery, Ms. Dillenbeck returned to Bloomindale around the beginning of March 2016, but was only hired back on as a receptionist part-time (though she expected to return to her cross-trained position). Tr. at 60-61, 97, 118-19. Accordingly, she worked fewer hours than she had before onset of her GBS. She was then terminated from her position because she was not able to return to full-time status (and participate in the physical tasks required for the technical components of the position). *Id.* at 49, 56, 58-60, 65, 112-13; *see* Ex. 16 at 11. In particular, as Ms. Dillenbeck explained, she was no longer able to lift/restrain the animals properly (due to her residual arm weakness), and she no longer had the stamina to keep up with the physical demands of the position overall. Tr. at 56-67.

As Respondent pointed out on cross-examination, Petitioner was medically cleared to return to work without restriction in late April 2016 – thus suggesting that in fact she had largely recovered sufficient to carry out her duties as a vet tech. Tr. at 50, 65; *see* Ex. 16 at 9. Notes from this medical visit do indicate that at this time, Ms. Dillenbeck had a restriction of not lifting more than 15 pounds, but she informed her treating neurologist, Dr. Gupta, that she no longer needed this restriction, as she could "lift her own dog at home without any difficulty (her dog weighs 70 pounds)". Ex. 4 at 4; *see* Tr. at 50-51, 55, 92-93. On direct examination, Ms. Dillenbeck explained that this was a reference to her pre-GBS strength. Tr. at 55. She later posited, however, that she could perform such a lift today, but not safely. *Id.* at 92-93. Ms. Dillenbeck attempted to explain the notation (and her express statement that she no longer required any lift restrictions) as the product of her desire to return to work (and earn a steady income), maintaining that Dr. Gupta essentially chose to assist her in this regard (despite her actual ongoing medical status). *Id.* at 115-16.

There is a factual dispute as to the circumstances of Ms. Dillenbeck's termination from Bloomingdale on May 16, 2016. Via cross examination, Respondent sought to establish that Ms. Dillenbeck was terminated from her position due to poor performance reviews. Tr. at 99-104. Various employment records from her time at the clinic reference instances of unsatisfactory performance (including lack of friendliness with staff and clients, untimely chart maintenance, incorrect client charges, and failure to administer proper dog food) as early as 2013 (two years *prior* to her receipt of the flu vaccine). *Id.* at 98-103; *see, e.g.*, Ex. 16 at 6 (May 4, 2016 notation of an incorrect client cash charge), 8 (May 16, 2016 warning notice referencing poor client interaction and slow decline in pace), 23 (noting instances of late arrivals from 2006 to 2012), 89-90 (2015 appraisal referencing a need for improvement regarding client interaction, chart maintenance/ordering supplies, prioritizing, alertness, and administering proper food), 98 (June 28, 2013 concern for improper chart maintenance and voiding invoices), 118-19 (February 26,

2013 notation of incorrect charges, slow pace, forgetfulness, and "trouble" making appointments), 120-21 (February 14, 2014 record noting a need for improvement in multitasking and completing duties without being told).

The record of Petitioner's May 2016 termination claims it was due to "unsatisfactory performance" and "lack of hours." Ex. 16 at 8 (May 16, 2016 termination). Indeed, it appears from that record that a decline in performance was noted to have begun well before Ms. Dillenbeck's receipt of the flu vaccine and ensuing illness. *See* Ex. 16 at 8 (indicating a "slow decline over the past year," and hence before the October 2015 vaccination). In addition, many of the complaints involved work not dependent on her physical ability to do the job (i.e., lack of friendliness, charging clients incorrectly, and administering the wrong dog food). Employment evaluations from 2013 and 2014 revealed similar complaints regarding interactions with co-workers, pace, and customer service skills. *See* Ex. 16 at 118-19, 120-21. Petitioner signed these reviews, suggesting her awareness of the problems. *Id.* at 119, 121.

Ms. Dillenbeck in response testified that she was unaware of these notes, and never received a formal written warning detailing any instances of improper conduct. Tr. at 100, 103-04, 105, 110-12. In fact, Ms. Dillenbeck argued that these events "never happened," and that her supervisors at Bloomingdale in fact "made this information up." *Id.* at 103. Her 2015 employee appraisal form specifically states that Ms. Dillenbeck "struggle[d] to keep up w/ charts[,]" had trouble "prioritiz[ing]" responsibilities, and "appears gruff & off putting" with customers and clients. *Id.* at 89-90. Records pertaining to Petitioner's termination noted various issues (including "unable to keep up w/ pace when busy, slow decline over past year[,] [b]ad repor [sic] w/ clients – have record some phone calls from clients of shortness, unapproachable, several mistakes"). *Id.* at 8.[8] As noted earlier, those same records indicate that she was let go due to "lack of hours" and "unsatisfactory performance." *Id.*

Following her termination, Ms. Dillenbeck was unemployed for three weeks before obtaining work as a receptionist at two other veterinary clinics (Barrington Square Animal Hospital and Knoll Animal Hospital), and as a pharmacy technician at Jewel-Osco Pharmacy, eventually starting her present job at Army Trail in mid-July 2018. Tr. at 66-70, 71, 95-97.[9] She maintained that she was unable to find another vet tech position because she could no longer perform the physical requirements the job demanded. *Id.* at 116-17. However, it is indisputable that Petitioner is *not* licensed in Illinois as a vet tech, with some clinics (Knoll Animal Hospital, for example) only willing to hire licensed individuals. *Id.* at 70, 116-18. Ms. Dillenbeck testified that she was aware that many veterinary clinics require vet techs to possess certain certification requirements. *Id*. at 117-18. Prior to her illness, she had considered going through the certification process. *Id.*

---

[8] Although Ms. Dillenbeck signed her 2013 and 2014 performance appraisals, it does not appear that she signed the 2015 appraisal or the termination record. *See* Ex. 16 at 3-4, 8, 119, 121.

[9] The record reflects that Ms. Dillenbeck's last day at Knoll Animal Hospital was June 26, 2018. Ex. 15 at 15-16.

at 117. However, she felt that is was an unnecessary expense (given that Bloomingdale allowed her to work without it). *Id.* at 117-18.

At hearing, Ms. Dillenbeck explained the circumstances of her departures from her post-Bloomingdale jobs. She testified that she was terminated from Barrington Square due to onset of an illness unrelated to GBS. Tr. at 67-69. She also testified, however, that the hours (i.e, twelve hours per day) were too strenuous. *Id.* at 67. Ms. Dillenbeck voluntarily left the pharmacy tech position because she found the eight-hour days on her feet were similarly too demanding. *Id.* at 67-69, 105. She also voluntarily left her subsequent job at Knoll as well, but did so in order to take advantage of the higher pay offered at Army Trail ($13.00 per hour for a receptionist position). *Id.* at 69-70, 106. Overall, the loss of income she has experienced since her illness has affected her ability to save and pay her bills. *Id.* at 72-74. In addition, Ms. Dillenbeck receives less paid vacation time, and no insurance coverage. *Id.* at 107, 113-14.

B.   Shawn Dillenbeck

Petitioner's second witness was her son, Mr. Shawn Dillenbeck. Tr. at 121-134; *see* Affidavit, dated February 15, 2019, filed as Ex. 21 (ECF No. 40-1). He testified telephonically at hearing and submitted a witness statement describing Ms. Dillenbeck's health course around the time she developed GBS and her recovery thereafter.

Prior to her hospitalization in December 2015, Mr. Dillenbeck was outgoing, active, and self-motivated. Tr. at 123. She enjoyed working with animals, taking long walks, and interacting with her grandchildren. *Id.* 123-24, 129, 132. After her onset of GBS, however, Petitioner experienced a cascade of adverse symptoms (including nerve pain, numbness/tingling, hypersensitivity to touch, and difficulty walking), some of which she continues to experience to this day. *Id.* at 123, 125-26, 128.

According to Mr. Dillenbeck, Petitioner's recovery process following her hospitalization for GBS was progressive, but slow. Tr. at 128. Ms. Dillenbeck required PT and in-home care following her discharge (which included multiple visits from family members who assisted with household tasks). *Id.* at 126-27. As Mr. Dillenbeck recalled, Petitioner still struggled with pain, persistent sensitivity to touch, and walking difficulties in the months following discharge. *Id.* at 127-28. She was eventually able to return to work, but the lack of energy she experienced made it difficult to complete the full work day. *Id.* at 128. As Mr. Dillenbeck explained, his mother's illness also affected her emotionally. *Id.* at 131-32. She experienced increased stress regarding her ability to pay bills and provide for herself financially. *Id.* at 132.

At present, Mr. Dillenbeck testified, Petitioner is doing much better. Tr. at 130. Her mobility has improved, but she continues to suffer from decreased grip strength and weakness. *Id.* at 130-31. Mr. Dillenbeck (and other family members) continue to assist with various household

tasks at times. *Id.* at 124, 130. Overall, Petitioner has not returned to her pre-illness baseline health, and the residual fatigue she experiences affects her life daily. *Id.* at 123-24, 130-32.

### C.   Miranda Szydzik

Petitioner's third witness was her daughter, Ms. Miranda Szydzik. She testified telephonically and submitted a witness affidavit detailing Ms. Dillenbeck's illness and recovery thereafter. Tr. at 136-41; *see* Affidavit, dated February 15, 2019, filed as Ex. 22 (ECF No. 40-2). Her testimony was consistent with that offered by both Petitioner and Mr. Dillenbeck. In addition, Ms. Szydzik discussed in more detail the residual effects of Petitioner's illness in the months following her hospitalization.

Ms. Szydzik provided live-in care to Petitioner for roughly five-months following her discharge from the hospital on December 8, 2015. Tr. at 137; Ex. 10 at 3. During that time period, she assisted with various household tasks (including cooking, laundry, driving, and caring for Petitioner's animals). Tr. at 137-39. She recalled that Ms. Dillenbeck suffered from multiple persistent symptoms over the course of her recovery (such as numbness in the arms/legs, sensitivity to touch, trouble sleeping, and increased tiredness). *Id.* at 136-38. She also had mobility issues and routinely experienced falls as a result. *Id.* at 137-38. Overall, Ms. Szydzik posited that Petitioner's course improved around the end of the five-month period following her illness. *Id.* at 138. In her view, however, Petitioner remains less active and can no longer participate in the activities to the same degree she was accustomed to prior to her onset of GBS (for example, taking long walks or going to the dog park). *Id.* at 136, 139.

### D.   Andrew Szydzik

Petitioner's final witness was her son-in-law, Mr. Andrew Szydzik. He testified telephonically at hearing and submitted one witness statement on Ms. Dillenbeck's behalf. Tr. at 142-148; *see* Affidavit, dated February 15, 2019, filed as Ex. 23 (ECF No. 40-3).

Mr. Szydzik also lived with Petitioner during the five-month period following her hospitalization. Tr. at 142. He and his wife assisted Ms. Dillenbeck with various chores and basic tasks during this time (including shopping for groceries and caring for her animals). *Id.* Mr. Szydzik recalled that Ms. Dillenbeck routinely required assistance with walking, and fell multiple times per day (even with the assistance of a walker). *Id.* at 142-43. To date, he continues to visit Ms. Dillenbeck at least twice per month to offer assistance with anything she might need. *Id.* at 145.

Similar to the earlier witnesses, Mr. Szydzik described Petitioner as active, outgoing, and independent prior to her illness. Tr. at 144-45. She was accustomed to living on her own, and provided for her own well-being. *Id.* at 142, 144-45. Following her illness, however, Ms.

Dillenbeck could no longer participate in her usual outdoor actives (i.e., going on long walks or to the dog park). *Id.* at 145-46.

**IV.     *Post-Hearing Briefing Regarding Lost Wages and Illinois Vet Tech Occupational Requirements***

As discussed earlier, Petitioner requests a total of $85,976.40 in lost wages related to her illness (representing $39,956.40 in past lost wages and $46,020.00 in future lost wages). Respondent posits that Petitioner is entitled to past lost wages in the amount of $7,230.00, and *no* future lost wages.

The majority of Petitioner's disputed claim for lost wages is premised on her allegation that she was unable to return to work as a vet tech at Bloomingdale Animal Hospital after recovering from her illness. Upon returning to Bloomingdale in March 2016 following her discharge and recovery, Ms. Dillenbeck was initially only allowed to work as a receptionist – at her former hourly rate but for fewer hours per week, before being terminated. Ms. Dillenbeck admitted at hearing that she was *not* licensed to practice as a vet tech, however, and thus could not locate other employment in the same position at different veterinary hospitals. Tr. at 116-19. But she also maintained, independent of her certifications, that her GBS made it impossible to continue to perform the physical tasks required of a vet tech.

Respondent filed a brief setting forth his position regarding Petitioner's lost wages request on May 1, 2019. *See* Post-Hearing Brief, dated May 1, 2019 (ECF No. 48) ("R. Post-Hr."). In it, Respondent argued that Petitioner's request (pertaining to both past and future lost wages) "is based on her misunderstanding of Illinois law . . . ." R. Post-Hr. at 2. As Respondent explained, on February 16, 2016 – almost exactly around the time Ms. Dillenbeck was first cleared for return to work – a new regulation took effect that in essence prohibited Ms. Dillenbeck from continuing to work as a vet tech without a state license. *Id.* at 2 (citing 68 Ill. Admin. Code Tit. § 1505 (2019)); *see* Ex. A. The regulation does not, however, expressly prohibit a clinic from hiring an uncertified vet tech, although it limits the duties an uncertified technician may perform unsupervised (i.e., trimming hooves, processing lab samples, obtaining streaks or cultures, and animal restraint), and requires direct supervision by a veterinarian for any other required tasks (thus limiting the degree to which a veterinary practice might utilize a vet tech for performance of acts it might otherwise rely on her to do independently). R. Post-Hr. at 2-3. Given that Petitioner had been employed as an *uncertified* vet tech prior to her illness *and* could no longer legally work as a vet tech under the Illinois regulation, Respondent contended that she offered no persuasive evidence showing how she could have continued to work in a similar position in the future (or following her termination). *Id.* at 3.

Otherwise, Respondent posited that Ms. Dillenbeck did not establish that the residual sequelae from her GBS prohibited her from working in any way (given the instances in record where Petitioner's treating neurologist, Dr. Gupta, expressly cleared her to work without

restriction). R. Post-Hr. at 3-4. Respondent also argued that Petitioner appears to have been terminated from her position at Bloomingdale Animal Hospital for poor work performance (as evidenced by her employment records), *not* due to an inability to complete her regular work responsibilities as a result of her GBS illness. *Id.* at 4-6.

Petitioner filed a responsive memorandum on June 3, 2019, contending that Respondent's reading of the Illinois regulation was "wholly incorrect." *See* Memorandum, dated June 3, 2019 (ECF No. 49) ("P. Post-Hr.") at 3.[10] Based on her own reading, Petitioner argues that nothing in the regulation prohibits a veterinary clinic in Illinois from hiring or retaining an unlicensed technician. P. Post-Hr. at 3-6. Rather, the regulation simply requires uncertified technicians to be more closely supervised and/or limits the types of tasks they can perform. *Id.* at 4-5.

Petitioner otherwise maintained that the multiple testifying fact witnesses corroborated her assertions that her onset of GBS rendered her physically unable to perform the job of a technician, and that her treating physician cleared her to return to work without restriction *only* because she had no other means of supporting herself. P. Post-Hr. at 6-8. In so stating, Petitioner also vehemently denied that she was terminated from her position at Bloomingdale due to poor performance (or lack of certification). *Id.* at 6. She should therefore be compensated for both past and future lost wages based on her pre-illness technician salary (given that working as a receptionist has caused a permanent reduction in her yearly earnings). *Id.* at 8-9.[11]

---

[10] Petitioner also filed a copy of the Illinois regulation. *See* Ex. 28 (ECF No. 50-1).

[11] Petitioner also maintains that Respondent's argument about state vet tech certification is untimely. P. Post-Hr. at 2-3. The relevant Illinois statue (which was effective in 2016) could have been invoked by Respondent long before this matter was set for hearing. *Id.* at 2. Given that Respondent only filed the statutory evidence a month *after* hearing (i.e., when the "record was effectively closed"), Petitioner maintains that any reliance on the regulation is prejudicial to her, and she urges that it be deemed untimely. *Id.* at 2-3.

I agree with Petitioner that the vet tech issue could have been substantively addressed in greater detail before hearing. However, I do not find that the dilatory filing of the Illinois statute is sufficiently prejudicial to Petitioner to strike it entirely, and/or the argument it supports. First, Vaccine Act petitioners routinely file relevant documents late in the judicial process, but their dilatoriness is overlooked given the Program's emphasis on fairness (which is necessarily a two-way street). Second, and more compellingly, the topic of Petitioner's qualification to continue to act as a vet tech is not only central to her lost wages claim but *was extensively addressed at hearing*. *See, e.g.*, Tr. at 116-119 (discussing Petitioner's awareness that she lacked the proper certifications to be a licensed Illinois vet tech). Finally, at the close of hearing I asked the parties to narrow their disputed issues, but also invited them to brief their positions on any remaining disputed damages components, and both sides succinctly did so. *Id.* at 163-64. Accordingly, the late filing of this document was hardly prejudicial to Petitioner, who was well aware that the issue was germane to her damages request.

## ANALYSIS

### I.   *Past Lost Wages*

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings," where the injured party's "earning capacity has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). As observed in *Brown v. Sec'y of Health & Human Servs.*, No. 01-60V, 2005 WL 2659072, at *6-8 (Fed. Cl. Spec. Mstr. Sept. 21, 2005), calculation of lost earnings damages must be performed in a "cautious manner in accordance with generally recognized actuarial principles and projections." Petitioners bear the burden of supporting a claim for lost earnings with preponderant evidence. Section 11(e).

With respect to the past lost wages component, Petitioner requests a total of $39,956.40, which she calculates by looking at four general periods of time:

(a) Nov. 15, 2015 (the first time Petitioner presented post-vaccination for medical care – albeit only in connection with symptoms resulting in her gallbladder surgery that preceded onset of her GBS symptoms (Ex. 7 at 6)) to February 29, 2016, during which time she was out of work entirely, receiving no sick pay from Bloomingdale;

(b) March 1, 2016,[12] through her termination by Bloomingdale on May 16, 2016, during which time she did not work full days (thus losing 21 hours per week over 11 weeks) but otherwise appears to have received the same hourly rate of pay she received pre-vaccination (*see* Tr. at 53; Ex. 27 at 12);

(c) May 17, 2016, through June 5, 2016, the three-week period in which she was unemployed after her termination from Bloomingdale; and

(d) June 6, 2016, until the end of 2018 – the approximately 19-month period in which she was either briefly unemployed again or worked the series of other jobs referenced above at a salary of $10.00 per hour (thus Petitioner requests the $4.50 difference from her Bloomingdale salary).[13]

P. Mem at 18-19.

Respondent, by contrast, argues that Petitioner is only entitled to past lost wages from the date of onset of her GBS symptoms (November 22, 2016), through when she was released to return

---

[12] Petitioner's brief incorrectly lists this date as March 7, 2016, but the number of weeks Petitioner worked at the reduced rate (eleven) is correct. *See* P. Mem. at 18.

[13] Ms. Dillenbeck testified at hearing that she began working at Army Trail (as a receptionist earning $13.00 per hour) in mid-July 2018. Tr. at 66-70, 71, 95-97. She is thus arguably not entitled to the $4.50 difference for the entirety of 2018 (as counsel proposes), as her salary went up to $13.00 per hour half way through the year. Petitioner's briefings did not account for this discrepancy (or explain the basis for such a request).

to work without medical restrictions on April 29, 2016, ignoring her subsequent employment history (and termination of employment at Bloomingdale). Opp. at 19. Accordingly, Respondent only concedes that Petitioner should receive $7,230.00 – a reduced percentage of categories (a) and (b) discussed above, and based upon Respondent's calculating the sum from November 22nd rather than November 15th.

Petitioner's entitlement to past lost wages largely turns on whether she could have reasonably expected to continue to work as a vet tech despite her injury – and if so, for how long. Petitioner maintains that she lost her job at Bloomingdale as a direct result of her GBS sequelae. She offered medical records (and fact witness testimony) which tended to show that she experienced a lengthy recovery process and some persistent symtoms (including weakness/fatigue, loss of grip strength, and lack of sensation in the hands) upon her return to work that made it difficult to perform the vet tech tasks as she had in the past. Respondent countered with the observation that Ms. Dillenbeck was cleared to return to work with no restrictions as of April 2016. This clearance also indicated that Petitioner was able to restrain/lift heavier animals (15 pounds or larger). But Petitioner's explanation for the clearance (i.e., that she asked for the restriction to be lifted so she could quickly return to work in order to receive needed income) was reasonable and credible, though she did admit at hearing that she could perform restraints/lifts to this magnitude if required to do so. Tr. at 55, 92-93.

Another factor impacting Ms. Dillenbeck's continued work as a vet tech was her qualification to hold this position, especially in light of changes in Illinois law. Respondent proffered evidence (i.e., an Illinois state regulation) which at a minimum makes it more difficult for an unlicensed technician to complete the relevant tasks associated with the position, subject to some discretion by an individual veterinary employer. While Ms. Dillenbeck has objected to consideration of aspects of this argument, she expressly acknowledged at hearing that she *does not* possess the required licensing certifications to work in such a capacity, and admitted that many clinics will no longer hire uncertified technicians due to the state's changed regulation. Tr. at 117-18.

Finally, there are the disputed circumstances of Ms. Dillenbeck's termination from Bloomingdale. Her employment file reveals that she was terminated due to "unsatisfactory performance" and "lack of hours." Ex. 16 at 8.[14] Indeed, the employment records filed herein establish that she had a history of performance complaints (which could have impacted her employer's decision to terminate her in 2016), including instances of reported unsatisfactory performance (such as lack of friendliness with staff/clients, untimely chart maintenance, failure to administer the proper animal food, and incorrectly charging client fees). Tr. at 98-103; Ex. 16 at 8, 98. Ms. Dillenbeck denied the accuracy of these purported deficiencies, maintaining instead that

---

[14] As noted earlier, this record lists various examples of "unsatisfactory performance" (including an inability to keep up with the pace when busy and poor client interaction), and describes Ms. Dillenbeck as unapproachable. Ex. 16 at 8. "Several mistakes" and a "slow decline over past year" were also listed, but not elaborated upon. *Id.*

13

she was terminated from her position primarily due to her inability to perform the physical tasks the job demanded (which were in turn attributable to her GBS sequelae). Once she was terminated from Bloomingdale, she could not find comparable employment as a vet tech.

Respondent does not dispute that Petitioner should receive lost wages from the onset of her GBS on November 22, 2015 (and I find this to be the appropriate date to begin the lost wages calculation – not when she left work for her separate gallbladder proceeding) through her termination from Bloomingdale (*see* R. Post-Hr. at 5), so the remaining question is whether she should receive past lost wages, based on the differential between her Bloomingdale pay and what she received from the other jobs she briefly held for the subsequent periods. I find that she should, calculating the period from her mid-May 2016 termination to mid-July 2018 and thereafter, at which time the record reflects she began her work at Army Trail at an hourly rate and work week comparable to that which she maintained at Bloomingdale.

This determination turns on my finding that it is likely, based on the evidence presented, that Ms. Dillenbeck could have maintained her vet tech job at Bloomingdale for some additional period of time, but for the physical limitations brought on by GBS. Although there is evidence from her employment record that she had some performance issues at Bloomingdale, and may have risked termination there at some point, it appears overall she successfully maintained the job until her injury. It is also evident that when she returned to work, Bloomingdale deemed her incapable of performing those same tasks, and therefore delegated her to a receptionist position (allowing the inference that Bloomingdale was concerned about her new physical limitations). Although the documents pertaining to her release to work ultimately suggest she was not deemed incapable of the physical tasks a vet tech would need to perform, I found credible Ms. Dillenbeck's explanation that the release was more the product of her need to return to work generally than an accurate reflection on her true health at the time.

Whether Ms. Dillenbeck was terminated due to her vaccine injury, as she proposes, or her own personnel failings at Bloomingdale, presents a closer question. Her employment records indicate that she had received prior performance criticisms, but it is unclear from her 2016 termination whether those motivated the separation, or whether they were invoked as a pretext to justify the decision (which was in fact attributable to her physical limitations). However, Ms. Dillenbeck and her family were credible in establishing that she was far from baseline in the early spring of 2016, and that her physical condition ultimately made it difficult if not impossible for her to perform her duties at work. The record also does not establish that her lack of vet tech certification was an equal consideration for Bloomingdale's termination decision, and so the change in the law around this time cannot be deemed the actual reason for the personnel act. With all of the above in mind, I find that preponderant evidence just barely supports the conclusion that Ms. Dillenbeck lost her Bloomingdale job due to her GBS sequelae.

Because of the above, I will use Ms. Dillenbeck's Bloomingdale salary of $14.50 per hour as a basis to compare what she earned from the date of termination through today, awarding her the difference when she earned less (or nothing, while she was unemployed). The Illinois law change did not preclude her continued employment in this period at Bloomingdale, and (despite the evidence of prior issues in her work performance) I do not find it likely that she would have been terminated that year, or even thereafter for the next almost two years[15], simply due to the change (although, as discussed below, the certification changes *do* bear on the likelihood that Ms. Dillenbeck could have continued to work as a vet tech *anywhere* other than Bloomingdale in the future).

I will therefore award lost past wages in an amount close to what Petitioner seeks, but with some adjustment, as follows:

(a), I will calculate the first component of lost wages from the date of Ms. Dillenbeck's first presentation of GBS symptoms, or November 22, 2015, to February 29, 2016 (as she returned to work on March 1, 2016). This amounts to a total of $7,612.50 (representing $14.50 x 35 hours per week for 15 weeks). *See* P. Mem. at 18;

(b) I will next award $3,349.50, representing the amount lost during her return to work at Bloomingdale (at the same rate, but at reduced hours per week) through her termination (from March 1, 2016, to May 16, 2016). *See id;* and

(c) for the remainder of 2016 through today's date, I will award Ms. Dillenbeck (i) $1,521.90 for the time she held no job (from May 16, 2016 through June 5, 2016), based on the assumption that she could have earned $14.50 per hour at Bloomingdale consistent with her pre-vaccination employment history; (ii) $11,790.00 for the period of time between June 6, 2016, and February 15, 2017 (where Ms. Dillenbeck worked 18 hours per week at rate of $10.00 per hour at Barrington Square and Jewel-Osco), with the difference based on her previous salary of $14.50 per hour for 35 hours of work per week; (iii) $1,015.00 for the period between February 15, 2017, until March 1, 2017 (two-week period of no work at her $14.50 per-hour salary); (iv) $6,490.00 for the period between March 1, 2017, and December 2017 (or 44 weeks where Ms. Dillenbeck worked at Knoll for 36

---

[15] I acknowledge that there is some inexactitude in determining that Ms. Dillenbeck could likely have continued to work at Bloomingdale until today, rather than some earlier date. Arguably the vet tech certification changes, coupled with the record evidence of performance problems, together mean that Petitioner could not reasonably have expected to maintain her Bloomingdale position for such a long period of time, and therefore my calculation should end at an earlier date (perhaps as early as the end of 2016). However, my overall weighing of the evidence – which takes into account Ms. Dillenbeck's continued GBS sequelae, the fact that she worked at Bloomingdale for many years before her injury, and the Vaccine Program's mandate of generosity – leads me to conclude that a fair past lost wages award should be so calculated, and that to do so is not arbitrary. Certainly the sum awarded is not great in magnitude either – especially since Ms. Dillenbeck was diligent in obtaining alternative employment (meaning that the lost wages calculation is mostly the small dollar difference between what she earned before and what she was earning after).

hours per week at $10.00 per hour, for a loss of $147.50 per week); (v) $4,130.00 from January 1, 2018, through mid-July 2018 (at which time Ms. Dillenbeck left her job at Knoll and transferred to Army Trail), which equates to 28 weeks of compensation[16] (where she worked 36 hours per week at $10.00 per hour, at a loss of $147.50 per week); and (vi) $2,916.00 from July 16, 2018, through July 29, 2019 (at which time Ms. Dillenbeck worked at Army Trail to the date of my decision, at a loss of $54.00 per week).

Based upon the above, I award Petitioner **$38,824.90** in past lost wages.

## II.   *Future Lost Wages*

The largest disagreement between the parties (in the context of lost wages) focuses on the issue of future lost wages. As discussed earlier, Petitioner maintains that she was terminated from her position as a vet tech as a direct result of her illness and resulting sequelae. Prior to her illness, she intended to work until age seventy. P. Mem. at 19. She is currently sixty-four. *Id.* Her future lost wages claim is thus calculated by multiplying a $147.00 per week loss in salary (the difference in the salary she received at Bloomingdale and her current receptionist salary at Army Trail) by six years, for a total of $46,020.00. *Id.*[17]

Respondent argues that Petitioner is entitled to no lost wages, given that it appears that she was capable of doing the physical work of a vet tech in light of her medical clearance, along with the fact that she appears to have been terminated from Bloomingdale for performance problems unrelated to her GBS sequelae. Respondent also urges the Court to consider the existence of Illinois state law, which he posits would have prohibited Ms. Dillenbeck from continuing to work as a vet tech anywhere.

Petitioner's future lost wages argument is dependent on the finding that she could have indefinitely maintained her position at Bloomingdale, or some place similar, as a vet tech but for her vaccine injury. There are, however, substantial reasons to doubt that supposition. First, Ms. Dillenbeck is not a certified vet tech, by her own admission, nor did she have plans to obtain this certification. *See* Tr. at 116-19. The 2016 changes in Illinois law, moreover, suggest that it will be significantly less likely in the future that a person like her could obtain vet tech employment – something she also admitted. *See id.* at 116-19. These factors are independent of Ms. Dillenbeck's GBS-caused physical limitations, and render it unlikely she could have worked as a vet tech in Illinois *anywhere* but Bloomingdale (with whom she had a fairly long employment relationship, and whom may have therefore been more willing to overlook these certification obstacles). Ms.

---

[16] Twenty-eight weeks allows for compensation until July 16, 2018.

[17] Petitioner also submitted a vocational summary report by Roberta Hurley. *See* Ex. 14 at 1. Ms. Hurley's report emphasized that Ms. Dillenbeck likely could not continue working as a vet tech due to her persistent GBS sequelae. *Id.*

Dillenbeck could not have reasonably expected to be hired in an unlicensed capacity as a vet tech in the present market, irrespective of her physical limitations.

Second, although I was able to determine that evidence relating to Petitioner's employment history barely preponderated in favor of a finding that she likely could have continued to work at Bloomingdale through today as a vet tech (consistent with her pre-vaccination status), I find it wholly speculative based on the same record to conclude that she could work as a vet tech at Bloomingdale *beyond* the present time period. It is here that Petitioner's documented record of performance issues at Bloomingdale becomes important. For, although I found that the record was close when it came to determining if her 2016 termination was attributable to performance problems or her GBS-related physical limitations, that same employment record (which suggests Petitioner's performance issues long pre-dated vaccination) does not permit the conclusion that she likely could have stayed there *indefinitely*. The combination of personnel issues and changes in the law do not preponderate in her favor.

Third, Ms. Dillenbeck's present employment circumstances reveal the degree to which she has recovered from her admittedly-ongoing GBS sequelae sufficient to almost equal her pre-vaccination status, further diminishing the need for a future lost wages award. She has succeeded in obtaining other full-time work at Army Trail Animal Hospital as a receptionist making $13.00 per hour (which is almost as much as she earned before). Tr. at 71. Prior to that, Ms. Dillenbeck held several jobs, some of which terminated for reasons she admitted had nothing to do with her GBS-related symptoms. Tr. at 67-68, 69. Clearly her vaccine-caused symptoms are not preventing her from holding any job at all (and as noted I cannot conclude that but for her GBS she would likely still be a vet tech today). Although the sum she is now earning may be slightly less than what she previously did, that fact does not mean she should receive the differential, absent a preponderant showing that the differential is the result of the injury.

All in all, it is too speculative to assume Petitioner could have maintained her position as a vet tech absent her ensuing injury – a linchpin prerequisite to awarding her lost future wages. *See, e.g.*, *J.T. v. Sec'y of Health & Human Servs.*, No. 12-618V, 2015 WL 5954352, at *6, *10-12 (Fed. Cl. Spec. Mstr. Sept. 17, 2015) (refusing to award speculative future lost wages based on petitioner's claim his injury prevented him from starting new business venture), *mot. for review den'd*, 125 Fed. Cl. 164 (2016). Therefore, I do not find any award of future lost wages to be appropriate in this matter.

III.     *Pain and Suffering*

The Vaccine Act caps total the amount of any pain and suffering damages component award at $250,000.00. Section 15(a)(4). Many Vaccine Program cases discuss calculation of two subcategories of pain and suffering awards – past (or "actual") and projected – and then adding them together, to come up with the total sum. *See, e.g.*, *Collado v. Secretary of Health & Human Services*, No. 17-0225V, 2018 WL 3433352, at *6-8 (Fed. Cl. Spec. Mstr. June 6, 2018). In prior

discussions of appropriate pain and suffering awards, Court of Federal Claims judges and special masters have considered three primary factors when determining an appropriate pain and suffering award: (a) severity of the injury, (b) awareness of the injury, and (c) duration of the suffering. *Id.* at *6.

A persuasive Court of Federal Claims decision issued within the last six years suggested that special masters should calculate the *total* pain and suffering award appropriate before applying the cap, rather than treating the cap as setting an absolute range of possible amounts and working solely within it. *Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579, 589-90 (2013). Although Respondent has argued (in this case[18] as well as others) that the latter approach is preferable to that outlined by *Graves* (especially since it appears in the past to have been the standard approach to calculation of pain and suffering)*,* and reasonably maintains that the cap should not be treated as a *de facto* basis for all pain and suffering awards, special masters appear to have accepted *Graves*'s methodology since issuance of that decision. *See, e.g., Bruegging v. Sec'y of Health & Human Servs.*, No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019); *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019). I will apply it herein as well, although I do so mindful of the need to consider the overall strength of Petitioner's showing herein (and also of the obvious fact that pain and suffering awards may in many cases appropriately fall below the cap).

Petitioner argues that her total pain and suffering exceeds the statutory cap. She requests $225,000.00 for the past pain and suffering component, and then $5,000.00 per year (based on an assumed additional life expectancy of 22 years) for future pain and suffering (or an additional $110,000.00). P. Mem. at 17. Petitioner emphasizes that her counsel has settled conceded pain and suffering damages awards in two prior cases involving GBS and the flu vaccine, and that both awards exceeded $200,000.00. *Id.* at 16; *see, e.g., Chatriand v. Sec'y of Health & Human Servs.*, No. 17-646V, 2018 WL 5262719 (Fed. Cl. Spec. Mstr. Aug. 20, 2018) (stipulating to $250,000.00 in pain and suffering damages); *Wiggins v. Sec'y of Health & Human Servs.*, No. 17-871V, 2018 WL 4390970 (Fed. Cl. Spec. Mstr. May 10, 2018) (stipulating to a lump sum of $200,000.00 for pain and suffering damages). Of course, because these do not reflect reasoned determinations setting forth the logic for each award, their persuasive value is limited.

Respondent disagrees, allowing that *some* pain and suffering award is appropriate in this case, but no more than $135,000.00 in total. ECF No. 47 at 2. He contrasts Petitioner's overall course with individuals found to have suffered GBS due to vaccination who required greater hospitalization than that experienced by Petitioner, experienced a significantly worse outcome, and/or where the injured party's overall damages award (which included significantly higher unreimbursed medical expenses and a Medicaid lien multiple times larger than that requested herein) underscored the appropriateness of the highest pain and suffering award allowable under

---

[18] *See* Opp. at 8-9.

the Act. Opp. at 14-15; *see, e.g.*, *Dighero v. Sec. of Health & Human Servs.*, No. 15-22V, 2017 WL 5246562 (Fed. Cl. Spec. Mstr. Oct. 19, 2017) (petitioner received $250,000.00 for pain and suffering in case featuring $188,991.75 for first-year, post-judgment expenses, annuity benefits, and a Medicaid lien totaling $243,584.82).[19] Ms. Dillenbeck's ongoing sequelae, by contrast, are relatively mild, permitting her to return to work not long after her hospitalization (and disputing Petitioner's argument that her job difficulties were solely attributable to those sequelae), and it is also possible that some of the continuing pain she experiences is attributable to Petitioner's pre-vaccination medical history (namely, her pre-existing rheumatoid arthritis). Opp. at 15-16.

As I noted at hearing, my initial sense of the case was that a total award coming under the cap – but closer to Petitioner's figure than where Respondent stood – was likely the most just result. Tr. at 154-56. I also noted that even if Petitioner's distress relating to her inability to continue working as a vet tech could not be factored into the lost wage calculation, it could be taken into account in calculating pain and suffering. *Id.* at 161-62.

Having had the chance to review all filings plus the hearing transcript, my initial sense has been confirmed, and therefore I shall award pain and suffering damages in the total sum of **$180,857.15**.

First, I shall award past pain and suffering in the amount of **$170,000.00**. Given the facts of this case, the bulk of any pain and suffering award Ms. Dillenbeck receives should reflect the personal cost of having to suffer with GBS initially and her recovery in the months following, as well as the role it may have played in negatively impacting her ongoing employment at Bloomingdale in her preferred position. Although, as noted above, the change in state certification for vet techs makes it speculative to guess to what degree Petitioner's GBS sequelae caused her to lose her job for purposes of calculating future lost wages, it is reasonable to include in my pain and suffering calculation the suffering she experienced in her professional life, and the lost opportunity to continue to perform vet tech duties from which she clearly took great pleasure. This amount also greatly exceeds the sum Petitioner purports to have lost after being terminated by Bloomingdale.

My pain and suffering calculation is consistent with other Program cases involving GBS injuries that have resolved favorably (with mild-to-moderate sequelae). *See, e.g.*, *Johnson v. Sec'y of Health & Human Servs.*, No. 16-135V, 2018 WL 5024012, at *7-9 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for pain and suffering in total for a resolved flu/GBS injury resulting in sequelae involving persistent fatigue, numbness in legs/feet, and incontinence). Indeed, flu/GBS injuries resulting in a petitioner's death often settle for an amount well under that which Petitioner in this case requests. *See, e.g.*, *Pfeifer v. Sec'y of Health & Human Servs.*, No. 17-1824V,

---

[19] Respondent also denies the relevance of many other pain and suffering determinations referenced by Petitioner, arguing that not only do they not involve GBS as the injury, but were either specific to the facts of the particular case or not explained in the decision with the precision necessary to make them useful comparable herein. Opp. at 15-17.

2019 WL 2281757, at *1 (Fed. Cl. Spec. Mstr. Mar. 15, 2019) (settlement awarding $215,000.00 in pain and suffering for flu/GBS injury resulting in petitioner's death); *Gipson v. Sec'y of Health & Human Servs.*, No. 17-1651V, 2019 WL 1451312, at *1 (Fed. Cl. Spec. Mstr. Feb. 25, 2019) (settlement awarding $175,000.00 in pain and suffering for flu/GBS injury resulting in petitioner's death).

Second, I shall award a lesser sum of $500.00 per year for future pain and suffering – which, accepting Petitioner's calculation over a 22-year period, comes out to **$11,000.00**. Although Ms. Dillenbeck has established that she continues to experience some ongoing sequelae that interfere in her enjoyment of life, a request for $5,000.00 per year is excessive under the circumstances. Lifetime/future pain and suffering awards in other contexts tend to avoid large lump sums in favor of more conservative annual awards. For example, in two cases involving unusually severe intussusceptions leading to expected lifetimes of abnormal bowel functions for the injured child, the special master awarded only $1,000.00 per year for the claimants' expected future hardship. *Neiman v. Sec'y of Health & Human Servs.*, No. 15-631V, 2016 WL 6459618, at *7 (Fed. Cl. Spec. Mstr. Aug. 22, 2016); *Brooks v. Sec'y of Health & Human Servs.*, No. 14-563V, 2016 WL 2656110, at *4 (Fed. Cl. Spec. Mstr. Feb. 26, 2016). A lesser sum is more reasonable under the circumstances.

In keeping with Vaccine Program practice, I must next reduce this $11,000 figure to its net present value. *See* Section 15(f)(4)(A) (requiring that future compensation awards be reduced to their net present value). The Supreme Court in *Jones & Laughlin Steel Corp.* noted that the "net discount method" should ordinarily be used in choosing a proper discount rate. *Childers v. Sec'y of Health & Human Servs.*, No. 96-194V, 1999 WL 218893, at *19 (Fed. Cl. Spec. Mstr. Mar. 26, 1999) (citing *Jones*, 462 U.S. 523, 538-50 (1983)). That same net discount method has been commonly utilized in other special master's decisions. *See, e.g.*, *Brown v. Sec'y of Health & Human Servs.*, No. 00-0182V, 2005 WL 2659073, at *9-10 (Fed. Cl. Sept. 21, 2005). Net discount rates utilized by other special masters have ranged from one percent to three percent, a somewhat higher range band than that utilized by non-Program cases. *See, e.g.*, *Neiman v. Sec'y of Health & Human Servs.*, No. 15-631V, 2016 WL 7741742, at *1 (Fed. Cl. Spec. Mstr. Oct. 31, 2016) (utilizing a net discount rate of one percent for the first fifteen years of an award); *J.T. v. Sec'y of Health & Human Servs.*, No. 12-618V, 2015 WL 5954352, at *13 (Fed. Cl. Spec. Mstr. Sept. 17, 2015) (adopting the respondent's suggested net discount rate of 1.5 to 1.6 percent); *Childers*, 1999 WL 218893, at *25 (employing a two percent net discount rate).

Neither party in the matter herein has proposed an appropriate net discount rate. As noted above, recent Program decisions have adopted a multi-pronged approach in order to account for the unusually low treasury interest rates of present day. *See, e.g.*, *Neiman*, 2016 WL 7741742, at *1 (utilizing a one percent rate for the first fifteen years of an award, followed by a two percent rate for all remaining years). I find such reasoning persuasive, and will therefore utilize a one percent net discount rate for the first fifteen years of this award, followed by a two percent net

discount rate for the remaining seven years. Applying this multi-pronged net discount rate, Petitioner's $11,000.00 award for future pain and suffering will be **$10,857.15**.[20]

Overall, I wish to stress the generosity of this pain and suffering award (especially in light of the amount I am awarding for past lost wages). Having seen Ms. Dillenbeck at hearing, I am convinced that she was negatively impacted by her GBS in many ways, and that she will have to live with the results of it for the remainder of her life. Certainly it played some role in her employment circumstances as well, at least with respect to her 2016 termination. However, she is qualitatively in a better place in her life than the most severely-injured vaccine petitioners often find themselves. The pain and suffering determination I have reached takes into account the suffering she has experienced, and aims to give her some redress for it – but also is scaled in comparison to the many substantially worse outcomes that have befallen many other Vaccine Act claimants.

### IV.    *Medicaid Lien*

The Act does not allow petitioners to recover compensation "for any item or service to the extent that payment has been made . . . under any Federal or state health benefits program . . . ." Section 15(g). This means that where claimants have received prior treatment for their vaccine injury under a Federal program like Medicaid, a lien arises against any Vaccine Program award for the value of that medical service. *See, e.g.*, *Simmons v. Sec'y of Health & Human Servs.*, No. 11-216V, 2019 WL 2572256 (Fed. Cl. Spec. Mstr. May 28, 2019).

Here, Petitioner calculates a Medicaid lien exists against her award in the sum of $403.24. Ex. 18 at 3. However, as Respondent observes, it appears that the treatment in question was directed not at Ms. Dillenbeck's GBS but at her preexisting arthritic condition. The medical records that coincide with the lien amounts charged on May 25, 2017, January 7, 2017, and December 6, 2017, correspond with visits to Petitioner's rheumatologist for treatment related to her arthritis. *See* Ex. 12 at 5, 7, 9.[21] While Petitioner did mention her GBS illness during these visits, there is no evidence that the treatment she received was related to that illness. *See id.* at 5, 7, 9. Petitioner maintained at hearing that these rheumatology visits included some discussion of her GBS sequelae (i.e., in the context of making sure her arthritis medication was not interfering with her GBS recovery). *See* Tr. at 74-75. While it may be the case that the effects of that treatment on Petitioner's GBS may have been considered, the submitted proof does not establish that this medical treatment was oriented toward her vaccine injury. As a result, I cannot permit the lien to be applied in this case to the damages award.

---

[20] This figure was calculated using the online present value calculator available at https://financial-calculators.com/present-value-calculator (compounding annually).

[21] Petitioner did not file medical visit records corresponding to the treatment charged on November 2 and 16, 2016, or August 28, 2017.

**CONCLUSION**

In light of the above, I calculate damages as follows:

| Damages category | Requested | Awarded | Difference |
|---|---|---|---|
| Unreimbursed Out-of-Pocket Expenses | $2,314.59 | $2,314.59 | N/A |
| Past Lost Wages | $39,956.40 | $38,824.90 | $1,131.50 |
| Future Lost Wages | $46,020.00 | $0.00 | $46,020.00 |
| Pain and Suffering | $250,000 (representing $225,000.00, plus $5,000.00 per year for 22 years, reduced by cap) | $180,857.15 | $69,142.85 |
| Medicaid Lien | $403.24 | $0.00 | $403.24 |
| **Total** | **$338,694.23** | **$221,996.64** | **$116,697.59** |

**As a result, I approve a Vaccine award of $221,996.64, which represents compensation for past unreimbursed expenses ($2,314.59), past lost wages ($38,824.90), and pain and suffering ($180,857.15) in the form of a check payable to Petitioner.**

This amount represents compensation for all items of damages that would be available under Section 15(a).

In the absence of a timely-filed motion for review (see Appendix B to the Rules of the Court), the Clerk **SHALL ENTER JUDGMENT** in accordance with this decision.[22]

**IT IS SO ORDERED.**

---

[22] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.

_/s/ Brian H. Corcoran_
Brian H. Corcoran
Special Master