# In the United States Court of Federal Claims

No. 17-428V
(Filed: February 6, 2020)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | |
| **GAYLE DILLENBECK,** | * | |
| | * | National Childhood Vaccine Injury |
| Petitioner, | * | Act, 42 U.S.C. §§ 300aa-1 et seq.; |
| | * | Damages for Lost Wages and Pain |
| v. | * | and Suffering; Loss of Earnings To |
| | * | Be Determined In Accordance With |
| **SECRETARY OF HEALTH AND** | * | Generally Recognized Actuarial |
| **HUMAN SERVICES,** | * | Principles and Projections; 42 |
| | * | U.S.C. § 300aa-15(a)(3)(A); |
| Respondent. | * | Remand. |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * | | |

Leah V. Durant, Law Offices of Leah V. Durant, PLLC, 1717 K Street NW, Suite 900, Washington, D.C. 20006, for Petitioner.

Joseph H. Hunt, C. Salvatore D'Alessio, Catharine E. Reeves, Alexis B. Babcock, Julia M. Collison, United States Department of Justice, Civil Division, Torts Branch, P.O. Box 146, Benjamin Franklin Station, Washington, D.C. 20044, for Respondent.

## OPINION AND REMAND ORDER

**WILLIAMS**, Senior Judge.

In the underlying action before the Special Master, Petitioner claimed that she developed Guillain-Barré syndrome ("GBS") as a result of receiving an influenza ("flu") vaccination, and sought compensation under the National Vaccine Injury Compensation Program. Respondent conceded that Petitioner satisfied the Table criteria for a flu/GBS injury, and the Special Master ruled that Petitioner was entitled to compensation. After a hearing, the Special Master issued a damages decision awarding Petitioner $180,857.15 in pain and suffering, $38,824.90 in past lost wages, and $2,314.59 in unreimbursed out-of-pocket expenses. The Special Master did not award

---

[1]  Pursuant to Vaccine Rule 18 of the Rules of the United States Court of Federal Claims, the Court issued its Opinion under seal to provide the parties an opportunity to submit redactions. The parties did not propose any redactions. Accordingly, the Court publishes this Opinion.

Petitioner future lost wages. Petitioner and Respondent timely filed cross-motions for review of the Special Master's decision.

Petitioner argues that the Special Master should have awarded Petitioner future lost wages as he granted past lost wages, and that he undervalued Petitioner's award for pain and suffering. Respondent argues that the award of past lost wages through the date of the Special Master's July 29, 2019 damages decision was arbitrary, as that date had no legal significance and was unrelated to Petitioner's health or employment. Respondent also argues that the Special Master erred by failing to offset Petitioner's past lost wages award for taxes and state unemployment payments.

The Court finds that the Special Master's pain and suffering award was not an abuse of discretion, and affirms that award. However, in determining lost wages, the Special Master did not articulate a rational basis for his choice of July 29, 2019, as the hypothetical date Petitioner's employment would have ended absent her vaccine injury. As such, the Special Master's lost wages determinations are remanded for reevaluation "in accordance with generally recognized actuarial principles and projections," as required by the Vaccine Act, 42 U.S.C. § 300aa-15(a)(3)(A) and further development of the record.

**Factual Background**[2]

On October 30, 2015, Petitioner received the flu and pneumococcal conjugate vaccines at her primary care provider's office. ECF No. 51 at 2. At the time of the vaccinations, Petitioner was 61 years old and had a history of rheumatoid arthritis, asthma, bone/joint problems, and anxiety. Id. Petitioner was employed as a receptionist and uncertified veterinary technician ("vet tech") at Bloomingdale Animal Hospital ("Bloomingdale") in Bloomingdale, Illinois, and had held this job for ten years.[3] Id. Approximately three weeks after the vaccinations, following a gallbladder surgery, Petitioner reported numbness in her feet and was assessed to have an ataxic gait. Id. Following a worsening of her symptoms, she was diagnosed with GBS in early December 2015. Id. After hospitalization for treatment, Petitioner was released on December 13, 2015, and continued outpatient physical therapy until the end of January 2016. ECF No. 51 at 2; ECF No. 53 at 2.

Petitioner was able to walk independently by January 20, 2016, and had improved significantly as of late February 2016. ECF No. 53 at 2; ECF No. 51 at 2-3. However, Petitioner still reported paresthesia in her hands and feet, reduced grip strength, absent reflexes, and a "wide-based gait." ECF No. 51 at 3. Petitioner was cleared to return to work, subject to a 15-pound lifting restriction, on February 17, 2016, and she returned to work at Bloomingdale on March 1, 2016. ECF 51 at 3; ECF No. 53 at 3.

Altogether, due to her gallbladder surgery and subsequent GBS treatment, Petitioner was out of work from November 15, 2015, through February 29, 2016, and the Special Master found

---

[2] This background is derived from the Special Master's damages decision, and the parties' motions papers.

[3] Although the Special Master found that Petitioner was a part-time employee at Bloomingdale prior to her vaccination, Petitioner contends that she was working 35-38 hours per week, which "was considered full-time employment with Bloomingdale." ECF No. 56 at 3.

that the date of onset of Petitioner's GBS symptoms was November 22, 2015.  ECF No. 51 at 2, n.4; ECF No. 51 at 12.  On February 16, 2016, while Petitioner was recovering at home, a new Illinois state regulation came into effect which imposed increased restrictions and supervision requirements on uncertified vet techs.  ECF No. 51 at 10; ECF No. 53 at 2-3.  The Special Master found that the Illinois regulation:

> in essence prohibited [Petitioner] from continuing to work as a vet tech without a state license.  The regulation does not, however, expressly prohibit a clinic from hiring an uncertified vet tech, although it limits the duties an uncertified technician may perform unsupervised . . . and requires direct supervision by a veterinarian for any other required task (thus limiting the degree to which a veterinary practice might utilize a vet tech for performance of acts it might otherwise rely on her to do independently).

ECF No. 51 at 10.  When Petitioner returned to work on March 1, 2016, Bloomingdale assigned her work as a receptionist, not a vet tech, at her pre-vaccination 2015 wage of $14.50/hour.  ECF No. 53 at 3.  In April 2016, Petitioner visited her neurologist, Dr. Vipan Gupta, and asked him to remove the 15-pound lifting restriction, as she was able to lift her 70-pound dog at home without issue.  Id. at 3.  On April 29, 2016, Dr. Gupta sent a letter informing Bloomingdale that Petitioner was "cleared to work without restrictions" as of that date.  Ex. 16 at 9.  A little over two weeks later and six months after her vaccination, Bloomingdale terminated Petitioner's employment on May 16, 2016, citing her "unsatisfactory performance," "slow decline over [the] past year," and a "lack of hours."  Ex. 16 at 8.

Petitioner's employment evaluations for the years 2012 and 2013, which pre-date her 2015 vaccination, noted issues with her customer service skills and efficiency.  Ex. 16 at 118-21.  Petitioner's 2013 evaluation stated that that her supervisor had met with Petitioner "a few times over the past year about customer [service] skills" and while Petitioner was "very receptive, . . . this area still need[s] continued improvement."  Id. at 120.  These evaluations never threatened any adverse employment consequences.

Three weeks following her termination from Bloomingdale, Petitioner found alternative employment, working as a receptionist at two other veterinary clinics and as a pharmacy technician.  ECF No. 51 at 7.  Petitioner presently works full-time as a receptionist at Army Trail Animal Hospital in Bartlett, Illinois for $13 per hour.  Id. at 5.  Though Petitioner's health has improved, it has not returned to baseline, with Petitioner estimating that she has regained 75 to 80 percent of her pre-illness strength.  Id.  Petitioner continues to experience GBS sequelae, including a lack of sensation in her hands and feet and loss of grip strength.  Id.

## **Procedural History**

On March 27, 2017, Petitioner filed a petition seeking compensation under the National Vaccine Injury Compensation Program, ("Vaccine Program") 42 U.S.C. § 300aa–10, et seq., alleging that her GBS was the result of her October 30, 2015 flu vaccine.  ECF No. 1.  Several months later, Respondent conceded that Petitioner satisfied the criteria in the Vaccine Injury Table and the **"**Qualifications and Aids to Interpretation for a Flu/GBS Table Injury,**"** and the Special Master ruled that Petitioner was entitled to compensation on October 23, 2017.  ECF Nos. 14, 15.  The Special Master held a hearing on damages on February 19, 2019.  ECF 51 at 2.

On July 29, 2019, the Special Master issued his damages opinion awarding Petitioner a total of $221,996.64, including $180,857.15 in pain and suffering, $38,824.90 in past lost wages and $2,314.59 in unreimbursed out-of-pocket expenses. Id. at 22. The Special Master did not award Petitioner future lost wages based on his finding that, absent her vaccine injury, Bloomingdale would have continued to employ her up until the July 29, 2019 date of his damages decision, but no further. Id. at 16-17. On August 28, 2019, Petitioner and Respondent timely filed cross-motions for review of the Special Master's damages award with this Court. ECF Nos. 53, 55.

## Discussion

**Jurisdiction and Standard of Review**

Congress created the Vaccine Program as a "Federal 'no-fault' compensation program under which awards can be made to vaccine-injured persons quickly, easily, and with certainty and generosity." H.R.Rep. No. 99-908, at 3 (1986). To that end, "Congress assigned to a group of specialists, the Special Masters within the Court of Federal Claims, the unenviable job of sorting through these painful cases and, based on their accumulated expertise in the field, judging the merits of the individual claims." Hodges v. Sec'y of Dep't of Health & Human Servs., 9 F.3d 958, 961 (Fed. Cir. 1993).

In Vaccine Act cases, the Court of Federal Claims has jurisdiction to undertake a review of the record of the proceedings and may:

> (A) uphold the findings of fact and conclusions of law and sustain the special master's decision, (B) set aside any of the findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or (C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa-12(e)(2)(A)-(C) (2012); Doe 93 v. Sec'y of Health & Human Servs., 98 Fed. Cl. 553, 564-65 (2011).

"Findings of fact of the special master are reviewed under the arbitrary and capricious standard, conclusions of law are reviewed under the not in accordance with law standard, and discretionary rulings are reviewed under the abuse of discretion standard." Broekelschen v. Sec'y of Health & Human Servs., 89 Fed. Cl. 336, 343 (2009), aff'd, 618 F.3d 1339 (Fed. Cir. 2010) (internal citations and quotation marks omitted).

The Federal Circuit has held

> An abuse of discretion occurs when (1) the court's decision is clearly unreasonable, arbitrary or fanciful (2) the decision is based on an erroneous conclusion of law (3) the court's findings are clearly erroneous; or (4) the record contains no evidence on which the [] court rationally could have based its decision.

Heat & Control, Inc. v. Hester Indus., Inc., 785 F.2d 1017, 1022 (Fed. Cir. 1986) (internal citations and quotation marks omitted).

In Snyder ex rel. Snyder v. Sec'y of Health & Human Servs., 88 Fed. Cl. 706 (2009), Chief Judge Sweeney encapsulated the interplay between the Special Masters' Congressionally-sanctioned discretion over evidentiary proceedings and the responsibility of reviewing courts, stating:

> In sum, when considering the provisions and legislative history of the Vaccine Act, the language of the Vaccine Rules, and the case law, one factor that has remained constant in the Vaccine Program is the necessary and important role of special masters in conducting proceedings and rendering decisions in Vaccine Act cases. The special masters have great leeway in how they conduct proceedings, including what evidence to consider and how to weigh that evidence, and their credibility determinations and fact-intensive conclusions are afforded great deference. However, this is not to suggest that the special masters are infallible and that their final decisions are sacrosanct. To be sure, the Court of Federal Claims on review, and the Federal Circuit on appeal, do not merely rubber stamp special master final decisions. Decisions from both courts demonstrate a willingness to reverse the decision of a special master when the special master has failed to adequately develop the record, failed to consider facts critical to the case, failed to give adequate consideration to a viable medical theory, or otherwise misapplied the law.

Id. at 718.

**The Special Master's Award of $180,857.15 in Pain and Suffering Damages Was Not an Abuse of Discretion**

Under the Vaccine Act, a Special Master may award an amount "not to exceed $250,000" for "actual and projected pain and suffering and emotional distress from [a] vaccine-related injury." 42 U.S.C. § 300aa-15(a)(4).

Here, Petitioner claims that the Special Master's grant of $180,857.15 for Petitioner's past pain and suffering was "too low given what petitioner has been through, the legislative history of the [Vaccine] Act and comparable awards in settled cases." ECF No. 51 at 22; ECF No. 56 at 14. Petitioner cites her "physical pain," the "loss of her profession," and her inability to "take long walks" and to care for her dogs, among other factors, as supporting a higher pain and suffering award. ECF No. 56 at 15-16. With respect to the loss of her status as a vet tech, Petitioner testified that she does not intend to become certified to perform this work, despite the change in Illinois law. Hr'g. Tr. 116-19. Petitioner references "numerous flu-GBS cases," litigated by Petitioner's counsel's law firm, which settled for "between $200,000 and $250,000 in pain and suffering, much higher values than awarded here." ECF No. 56 at 16. However, the Special Master found that, "because these [settlements] do not reflect reasoned determinations setting forth the logic for [the amounts of] each award, their persuasive value is limited." ECF No. 51 at 18.

Contrary to Petitioner's assertions, the Special Master properly took into account a full range of considerations in his pain and suffering determination, including Petitioner's health and ongoing sequelae, his personal observation of Petitioner's condition, Petitioner's inability to engage in certain activities, as well as the amount of compensation awarded in three comparable

cases.[4] The Special Master noted that Petitioner herself testified that she had regained "roughly seventy-five to eighty percent of her pre-illness strength." Id. at 5, 19. While other petitioners experienced "significantly worse outcome[s]" from flu/GBS injuries, Petitioner here was able to "return to work not long after her hospitalization," and currently works full-time. Id. at 18-19.

The Special Master appreciated "the personal cost of [Petitioner] having to suffer with GBS initially and her recovery in the months following, as well as the role it may have played in negatively impacting her ongoing employment at Bloomingdale in her preferred position." ECF No. 51 at 19. He stated "[h]aving seen [Petitioner] at hearing, I am convinced that she was negatively impacted by her GBS in many ways, and that she will have to live with the results of it for the remainder of her life." Id. at 21. As such, the Special Master weighed both Petitioner's "actual and projected pain and suffering" consistent with the mandate of the Vaccine Act. 42 U.S.C. § 300aa-15(a)(4).

Petitioner has not demonstrated that the Special Master's award of pain and suffering damages was too low as compared to other decisions or that the Special Master failed to consider any pertinent information in arriving at his pain and suffering determination. Accordingly, the Special Master's decision is affirmed as to the pain and suffering award.

**The Special Master Did Not Comply with the Vaccine Act in Awarding Lost Earnings Up Until, But No Later Than, July 29, 2019.**

Both parties challenge the Special Master's factual finding that, but for Petitioner's vaccine-related injury, Bloomingdale would have employed Petitioner until, but no later than, July 29, 2019. Aside from being the date of the Special Master's damages decision, that date had no relation to any factual evidence, expert opinion, or legal principle involved. See ECF No. 53 at 8; ECF No. 56 at 13.

Respondent challenges the Special Master's decision to award past lost wages at all, arguing that the Special Master abused his discretion by finding that Bloomingdale would have continued to employ Petitioner, an uncertified vet tech, after the Illinois law change in February 2016. Respondent further argues that the Special Master's choice of the July 29, 2019 date was arbitrary because "this date had no significance to petitioner's career," and record evidence suggested that, due to the change in Illinois law in early 2016 tightening restrictions on employment of uncertified vet techs like Petitioner, she likely "would not have been able to continue work as a vet-tech or at her pre-vaccination employer well before the date of the damages hearing, regardless of her GBS diagnosis." ECF No. 53 at 8.

---

[4] These Vaccine Program cases involved flu/GBS injuries, including one with a $180,000 pain and suffering award. See Johnson v. Sec'y of Health & Human Servs., No. 16-1356V, 2018 WL 5024012, at *9 (Fed. Cl. Spec. Mstr. July 20, 2018). In Johnson, the petitioner was 61 years old at the time of her flu vaccine, and experienced similar GBS sequelae to Petitioner, including persistent fatigue and residual numbness in her legs and feet. Id. at *7-8; see also Gipson v. Sec'y of Health & Human Servs., No. 17-1651V, 2019 WL 1451312, at *1 (Fed. Cl. Spec. Mstr. Feb. 25, 2019) (awarding $175,000 in pain and suffering where the flu/GBS vaccine injury resulted in the petitioner's death).

Petitioner, in turn, argues that the Special Master was wrong to limit damages to July 29, 2019, and deny Petitioner future lost wages. ECF No. 56 at 1. Petitioner contends that the grant of past lost wages was inconsistent with the denial of future lost wages when Petitioner's health had remained unchanged for several years. In addition, Petitioner contends that the Special Master inconsistently weighed Petitioner's documented job performance issues in assessing her termination from Bloomingdale. ECF No. 56 at 1, 11, 13.

In his decision, the Special Master found that "Petitioner's entitlement to past lost wages largely turns on whether she could have reasonably expected to continue to work as a vet tech despite her injury – and if so, for how long." ECF No. 51 at 13. After weighing the evidence, the Special Master determined Petitioner was entitled to lost past wages because "preponderant evidence just barely supports the conclusion that [Petitioner] lost her Bloomingdale job due to her GBS sequelae." Id. at 14.

In calculating Petitioner's past lost wages, the Special Master reasoned:

> [T]he remaining question is whether [Petitioner] should receive past lost wages, based on the differential between her Bloomingdale pay and what she received from the other jobs she briefly held for the subsequent periods. I find that she should . . . This determination turns on my finding that it is likely, based on the evidence presented, that [Petitioner] could have maintained her vet tech job at Bloomingdale for some additional period of time, but for the physical limitations brought on by GBS . . . I find that preponderant evidence just barely supports the conclusion that [Petitioner] lost her Bloomingdale job due to her GBS sequelae. Because of the above, I will use [Petitioner's] Bloomingdale salary of $14.50 per hour as a basis to compare what she earned from the date of termination through today, awarding her the difference when she earned less (or nothing, while she was unemployed). The Illinois law change did not preclude her continued employment in this period at Bloomingdale, and (despite the evidence of prior issues in her work performance) I do not find it likely that she would have been terminated that year, or even thereafter for the next almost two years, simply due to the change . . . .

ECF No. 51 at 14-15. In a footnote, the Special Master stated:

> I acknowledge that there is some inexactitude in determining that [Petitioner] could likely have continued to work at Bloomingdale until today, rather than some earlier date. Arguably the vet tech certification changes, coupled with the record evidence of performance problems, together mean that Petitioner could not reasonably have expected to maintain her Bloomingdale position for such a long period of time, and therefore my calculation should end at an earlier date (perhaps as early as the end of 2016). However, my overall weighing of the evidence – which takes into account [Petitioner's] continued GBS sequelae, the fact that she worked at Bloomingdale for many years before her injury, and the Vaccine Program's mandate of generosity - leads me to conclude that a fair past lost wages award should be so calculated, and that to do so is not arbitrary.

Id. at 15, n. 15.[5]

The Special Master found that Petitioner's entitlement to future lost wages was "dependent on the finding that she could have indefinitely maintained her position at Bloomingdale, or some place similar, as a vet tech but for her vaccine injury." Id. at 16. The Special Master found that there were "substantial reasons to doubt that supposition," stating:

> [A]lthough I was able to determine that evidence relating to Petitioner's employment history barely preponderated in favor of a finding that she likely could have continued to work at Bloomingdale through today as a vet tech (consistent with her pre-vaccination status), I find it wholly speculative based on the same record to conclude that [Petitioner] could work as a vet tech at Bloomingdale *beyond* the present time period. It is here that Petitioner's documented record of performance issues at Bloomingdale becomes important. For, although I found that the record was close when it came to determining if her 2016 termination was attributable to performance problems or her GBS-related physical limitations, that same employment record (which suggests Petitioner's performance issues long pre-dated vaccination) does not permit the conclusion that she likely could have stayed there *indefinitely*. The combination of personnel issues and changes in the law do not preponderate in her favor.

Id. at 17 (emphasis in original). Accordingly, the Special Master found it "too speculative to assume Petitioner could have maintained her position as a vet tech [past July 29, 2019] absent her ensuing injury" and denied future lost wages. Id.

As a preliminary matter, this Court affirms the Special Master's factual finding that Bloomingdale terminated Petitioner due to her GBS sequelae, as record evidence supports this conclusion. Acknowledging that it was a close question, the Special Master drew plausible inferences from Petitioner's ten-year history of employment at Bloomingdale, the fact that Bloomingdale did not cite the change in Illinois regulations or Petitioner's uncertified status as reasons for her termination, and the short time (roughly six months) separating her GBS/flu injury and termination.

However, regarding the amount of lost wages awarded, the Special Master failed to adduce actuarial evidence as required by the Vaccine Act. Specifically, the Vaccine Act mandates that compensation awarded under the Vaccine Program "shall include . . . compensation for actual and anticipated loss of earnings <u>determined in accordance with generally recognized actuarial principles and projections</u>." 42 U.S.C. § 300aa-15(a)(3)(A) (emphasis added).[6] Nor did the

---

[5] This past lost wages award included compensation at Petitioner's Bloomingdale salary rate of $14.50 per hour for the 17 weeks Petitioner was out of work and the difference between $14.50 and her actual salary for the time Petitioner was employed from November 22, 2015 until July 29, 2019. Id. at 15-16.

[6] The Special Master noted in his damages decision that "calculation of lost earnings damages must be performed in a 'cautious manner in accordance with generally recognized actuarial principles and projections.'" ECF No. 51 at 12 (citing Brown v. Sec'y of Health &

Special Master explain why lost wages up until the particular date of July 29, 2019, were warranted.

With no connection to Petitioner's health or employment or actuarial principles or projections, the Special Master's determination that lost wages should end on the date of his decision failed to comply with the Vaccine Act's requirement that lost wages be determined "in accordance with generally recognized actuarial principles and projections." 42 U.S.C. § 300aa-15(a)(3)(A).

**Relevant Evidence in Lost Wages Determinations**

The Federal Circuit has not interpreted what qualifies as "generally recognized actuarial principles and projections." The Vaccine Act "does not envision that 'anticipated loss of earnings' includes speculation." See J.T. v. Sec'y of Health & Human Servs., No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Spec. Mstr. Sept. 17, 2015) (rejecting petitioner's "speculative" claim for lost earnings from a business he had never started).

Decisions interpreting "actuarial principles" in the broader context of other federal and state statutes have required actuarial data and expert opinions. See, e.g., Chabner v. United of Omaha Life Ins. Co., 994 F. Supp. 1185, 1194 (N.D. Cal. 1998), aff'd, 225 F.3d 1042 (9th Cir. 2000) (holding that "sound actuarial principles" under the Americans with Disabilities Act "must . . . include reference to some sort of actuarial data either in the form of actuarial tables or clinical studies estimating mortality rates"); Fleisher v. Phoenix Life Ins. Co., 18 F. Supp. 3d 456, 480 (S.D.N.Y. 2014) (considering conflicting expert testimony when analyzing "accepted actuarial principles" under a New York statute).

This Court recognizes that the determination of compensation for lost earnings "in accordance with generally recognized actuarial principles and projections" would likely require expert opinion evidence. As one district court explained:

> In this Court's experience, when calculating future lost wages, economists typically rely on other experts—such as vocational rehabilitation experts—to advise them as to the income a plaintiff can probably earn due to his injuries. Economists then use that information in conjunction with actuarial data to estimate the wage loss the plaintiff will probably sustain over the course of his lifetime.

Dunmiles v. Jubilee Towing, LLC, No. CV 16-14325, 2017 WL 1212091, at *4 (E.D. La. Apr. 3, 2017). See LaMorte v. Penn Cent. Transp. Co., 450 F.2d 956, 957 (3d Cir. 1971) (affirming award of lost earnings supported by actuarial testimony); Fitzpatrick v. United States, 754 F. Supp. 1023, 1037 (D. Del. 1991) (denying compensation for lost wages under the Federal Tort Claims Act where plaintiff failed to produce "actuarial expert" testimony that "would have allowed the Court to make an award for lost wages for [the plaintiff's] services").

Petitioner in this case presented limited evidence of this nature. The only such evidence is a one-page letter dated March 13, 2018, from a Vocational Rehabilitation specialist, who opined that "it is highly unlikely that [Petitioner] will ever again be able to obtain employment as a

---

Human Servs., No. 00-0182V, 2005 WL 2659073, at *6-8 (Fed. Cl. Spec. Mstr. Sept. 21, 2005)). However, his decision included no citation to or analysis of actuarial evidence.

9

Veterinary Technician." Pet's Ex. 14 at 1. However, the Special Master did not explain how this opinion letter informed his award of lost earnings through July 29, 2019. The Special Master only referenced the letter when detailing how Petitioner herself had calculated her future lost wages claim. In this Court's view, a one-page letter from a Vocational Specialist is not sufficient to satisfy the Vaccine Act's mandate for application of "generally recognized actuarial principles and projections" in awarding lost earnings.

The decision in Brown v. Sec'y of Dep't of Health & Human Servs., No. 00-0182V, 2005 WL 2659073 (Fed. Cl. Spec. Mstr. Sept. 21, 2005), is instructive of what evidence Special Masters have considered under similar circumstances. In that case, the Special Master was tasked with determining lost wages when a "talented young executive who was being groomed for upper management" contracted GBS after a tetanus vaccination. Id. at *1, 7. The respondent argued that the petitioner had failed to demonstrate any lost earnings because the petitioner "continued to retain employment following the vaccine related injury and eventually lost his position, not necessarily as a result of the injury, but due to other corporate considerations." Id. at *7.

At a hearing on damages, the Special Master in Brown heard testimony from "an expert in employment and vocational rehabilitation," as well as from "two well-qualified economists" specializing in economic and personal loss evaluations, including loss resulting from injury or death. Id. at *1, n. 1-2. These experts presented a range of evidence, including the petitioner's average work-life expectancy absent the vaccine injury, the precise reduction in salary attributable to the injury, and the petitioner's pre-injury anticipated average annual salary growth rates. See also Petronelli v. Sec'y of Health & Human Servs., No. 12-285V, 2016 WL 1085455, at *2 (Fed. Cl. Spec. Mstr. Feb. 22, 2016) (considering expert evidence as to the petitioner's anticipated salary based on her specific profession and locality). Additionally, the petitioner in Brown presented "persuasive fact witness testimony" from several witnesses establishing that he lost a valuable promotion "as a direct result of his injury and extended hospitalization."[7] 2005 WL 2659073 at *7. Based on the evidence, the Special Master in Brown awarded both past and future lost wages. Id. at *7-11.

By statute, the Special Master may require whatever evidence "as may be reasonable and necessary." 42 U.S.C. § 300aa-12(d)(3)(B)(i)-(iii). In keeping with the "inquisitorial format" of Vaccine Program proceedings, Special Masters exercise unique control over the evidence to be adduced and considered. Snyder ex rel. Snyder v. Sec'y of Health & Human Servs., 88 Fed. Cl. 706, 738 (2009) (citing H.R.Rep. No. 101-386, at 87). The Federal Circuit has emphasized that "Congress desired the special masters to have very wide discretion with respect to the evidence they would consider and the weight assigned to that evidence." Whitecotton by Whitecotton v. Sec'y of Health & Human Servs., 81 F.3d 1099, 1108 (Fed. Cir. 1996). The Vaccine Act states:

---

[7] By contrast, at the damages hearing in the instant case, the Special Master heard testimony from four witnesses: Petitioner, her son, Shawn Dillenbeck, her daughter, Miranda Szydzik, and her son-in-law, Andrew Szydzik. ECF No. 51 at 4-10. Aside from Petitioner, these witnesses testified mainly to the physical symptoms of petitioner's GBS, its effects on her life, and her continuing sequelae. Id.

    (B) In conducting a proceeding on a petition a special master--

        (i) may require such evidence as may be reasonable and necessary,

        (ii) may require the submission of such information as may be reasonable and necessary,

        (iii) may require the testimony of any person and the production of any documents as may be reasonable and necessary,

        (iv) shall afford all interested persons an opportunity to submit relevant written information—

            (I) relating to the existence of the evidence described in section 300aa-13(a)(1)(B) of this title, or

            (II) relating to any allegation in a petition with respect to the matters described in section 300aa-11(c)(1)(C)(ii) of this title, and

        (v) may conduct such hearings as may be reasonable and necessary.

42 U.S.C. § 300aa-12(d)(3)(B).

    Vaccine Rule 3(b) states:

    The special master is responsible for conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded; and endeavoring to make the proceedings expeditious, flexible, and less adversarial, while at the same time affording each party a full and fair opportunity to present its case and creating a record sufficient to allow review of the special master's decision.

    The Court of Federal Claims may remand a vaccine case to the Special Master "for further development of the evidentiary record, as well as additional fact-finding." See Hokkanen v. Sec'y of Health & Human Servs., 94 Fed. Cl. 300, 302 (2010); 42 U.S.C. § 300aa–12(e)(2). The Court may instruct the Special Master to hold additional evidentiary proceedings, allow testimony from new witnesses, and "prepare a decision that reasonably analyzes all of the relevant evidence of record." See Boley v. Sec'y of Health & Human Servs., 82 Fed. Cl. 407, 408-14 (2008). Here, because the Special Master's past and future lost wages determinations did not reference actuarial considerations, both the past and future lost wages calculations are remanded for further development of the record and consideration of "generally recognized actuarial principles and projections." 42 U.S.C. § 300aa-15(a)(3)(A).

**Offsets to Vaccine Act Compensation**

    Respondent argues that the Special Master erred "because he did not apply appropriate offsets" for applicable taxes and state unemployment benefits to Petitioner's lost earnings award. ECF No. 53 at 13. The Vaccine Act, 42 U.S.C. § 300aa-15(g), provides that "[p]ayment of compensation under the Program shall not be made for any item or service to the extent that

11

payment has been made, or can reasonably be expected to be made, with respect to such item or service . . . under any State compensation program." Accordingly, "an award under the Vaccine Act is offset to the extent the petitioner is entitled to receive payments from certain specified programs." Heinzelman v. Sec'y of Health & Human Servs., 681 F.3d 1374, 1376 (Fed. Cir. 2012). Additionally, the Federal Circuit has stated that "it is appropriate to deduct federal and state income taxes when determining a lost earnings award under the Vaccine Act." Id. at 1378; Euken by Euken v. Sec'y of Dep't of Health & Human Servs., 34 F.3d 1045, 1048 (Fed. Cir. 1994) (holding that "FICA tax, like federal and state income taxes, is an appropriate tax to deduct in determining a lost earnings award under the Vaccine Act"). On remand, the Special Master shall apply appropriate tax and state compensation payment deductions to any lost wages award.

## Conclusion

The Special Master's pain and suffering award is affirmed.

The Special Master's decision as to past and future lost wages is remanded for further development of the record, and the Special Master is directed to reevaluate Petitioner's entitlement to lost wages "in accordance with generally recognized actuarial principles and projections." 42 U.S.C. § 300aa-15(a)(3)(A).

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Senior Judge**